UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| **MEREDITH LOWE,** | ) |
| Plaintiff, | ) ) ) |
| vs. | ) CAUSE NO. 1:11-cv-1714-WTL-DML ) |
| **PATRICK DONAHOE,** **POSTMASTER GENERAL,** **UNITED STATES POSTAL SERVICE,** | ) ) ) ) |
| Defendant. | ) |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (dkt. no. 49). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the following reasons.[1]

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

---

[1] Accordingly, the Defendant's motion to continue the trial date (dkt. no. 59) is **DENIED AS MOOT**.

that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The facts that follow are those taken in the light most favorable to the Plaintiff, Meredith Lowe. Additional relevant facts are included in the Discussion section below.

Ms. Lowe began working for the United States Postal Service ("USPS") in September 1988 as a part-time mail carrier. In 1992, she was promoted to supervisor of customer service. She was transferred to the Oaklandon branch in 1993, and was promoted to manager of that branch in October 1999.

In 2008, Ms. Lowe entered into a settlement agreement with the USPS after she filed an Equal Employment Opportunity ("EEO") complaint. Pursuant to this settlement, Ms. Lowe received her choice of supervisor positions and was awarded the highest pay rate for that position. Thus, on January 25, 2010, Ms. Lowe began working as a supervisor at the Eastgate Station.

As supervisor, Ms. Lowe performed a number of duties including, among others, ensuring that mail was delivered in a timely manner, supervising clerks, preparing work schedules, and keeping track of the money at the clerk stations. Ms. Lowe's work hours were from 10:00 a.m. to 7:00 p.m. As such, she was responsible for closing the Eastgate Station each evening and submitting a Customer Service Close Out Log to the Customer Service Operations Manager ("CSOM"). This Close Out Log reported whether mail carriers worked longer hours

2

than what they had been scheduled, if any accidents were reported, and if any mail delivery failures occurred for that day.

In February 2010, Christina Johnson-Kennedy became the CSOM of the Eastgate Station; as such, she was Ms. Lowe's supervisor. Ms. Johnson-Kennedy reported problems with Ms. Lowe's work performance. For instance, Ms. Johnson-Kennedy had to discuss the requirements for the Close Out Log with Ms. Lowe, she felt that Ms. Lowe took much longer than necessary to perform certain tasks, and she noted that Ms. Lowe struggled to arrive to work on time. Accordingly, Ms. Johnson-Kennedy arranged for Ms. Lowe to attend additional training from March through May of 2010.

On March 6, 2010, Ms. Lowe's children had a school function that she desired to attend. She asked Ms. Johnson-Kennedy if she could leave work early—at 4:30 p.m.—in order to attend the function. Her children were going to be dropped off at the station, and they would leave together to attend the function. Ms. Johnson-Kennedy obliged, noting that she would be at the station that afternoon to cover Ms. Lowe's absence. At approximately 1:00 p.m. on March 6, 2010, Ms. Johnson-Kennedy requested that Ms. Lowe deliver eight mail pieces. Ms. Lowe told Ms. Johnson-Kennedy that she would also investigate a customer complaint at Whittier Place while she was out. Ms. Lowe did so, and returned to the Eastgate Station at 4:45 p.m., when she left to attend her children's school function. Ms. Lowe did not clock-out, so Ms. Johnson-Kennedy left a Postal Service form for Ms. Lowe to complete when she returned to the Eastgate Station.

Later that evening, Ms. Johnson-Kennedy called Cathy Vaughn, another CSOM, to give her a report. Ms. Vaughn reported that she saw Ms. Lowe at the Main Post Office, located in downtown Indianapolis, between 3:30 and 4:00 p.m. She observed Ms. Lowe speaking to a man,

3

and saw Ms. Lowe's children in her car. Ms. Johnson-Kennedy thus began an investigation into Ms. Lowe's whereabouts on March 6, 2010.

When Ms. Lowe returned to work on March 9, 2010, she initialed the Postal Service form, correcting it to reflect that she left at 4:50 p.m., on March 6, 2010. Ms. Johnson-Kennedy then confronted Ms. Lowe about her whereabouts on March 6, 2010. Ms. Lowe told Ms. Johnson-Kennedy that she had a family emergency and had to go downtown to meet a friend and pick up her children because the friend was unable to make it to the Eastgate Station to drop off her children. She then drove her children to her father's house. She admitted to Ms. Johnson-Kennedy that it did not take her three hours to deliver the eight mail pieces, she understood that she did not have authorization to go downtown, that she had run a personal errand on work time, and that she actually left the Eastgate Station at 6:05 p.m., on March 6, 2010.

Ms. Johnson-Kennedy submitted a request for disciplinary action on March 17, 2010, for falsification of a Postal Service form and unauthorized transport of children while on work time. A Proposed Letter of Warning in Lieu of the 14-Day Suspension was recommended for Ms. Lowe's actions on March 6, 2010, and a Proposed Letter of Warning was issued to Ms. Lowe on March 30, 2010. This was despite the fact that in the past, Ms. Lowe was not always required to take personal time if an emergency situation arose as long as she made up her hours.

The following year, in March 2011, Regina Calhoon[2] replaced Ms. Johnson-Kennedy as the CSOM at the Eastgate Station. Ms. Calhoon also reported issues with Ms. Lowe's job performance. For example, on March 29, 2011, Ms. Lowe reported that all mail had been processed for delivery in her Close Out Log; however, Ms. Calhoon found mail that should have

---

[2] Ms. Calhoon was married in 2012 and changed her last name to Schmidt. For the purpose of this Entry, the Court will refer to her as Ms. Calhoon, as that was her name at the relevant times.

been processed on March 29, 2011, sitting in a cart on March 30, 2011.  Similarly, on April 2, 2011, the Eastgate Station received 20,000 First Class Mail postcards to be mailed; however, because there were not enough clerks to process the postcards, Ms. Lowe returned them to the Processing and Distribution Center ("P&DC").  This caused the delivery of the postcards to be delayed; however, according to Ms. Calhoon's supervisor, Kevin Blaine, nothing else could have been done to prevent the delay.  Finally, on April 4, 2011, Ms. Lowe was assigned to conduct street observations of the mail carriers and was to distribute packages to them so they could be delivered.  She failed to do so, instead placing the packages in a mail tub at the Eastgate Station.

Ms. Calhoon conducted an investigative interview with Ms. Lowe on April 14, 2011.  During the interview, Ms. Lowe stated that she did not believe sending the postcard mailing back to the P&DC was the proper procedure, that she had not paid close enough attention to her end-of-the-day reports, and that she did not have time to perform the observations and distribute the packages.  After this interview, on April 16, 2011, Ms. Calhoon prepared a request for disciplinary action charging Ms. Lowe with failure to perform her duties, causing delayed returned first class mail to plant, and causing delayed first class and priority packages.  Removal was suggested to be the appropriate sanction.  On April 29, 2011, Ms. Lowe received the Notice of Proposed Removal.  Shortly thereafter, Ms. Calhoon expressed her happiness over the discipline, saying, "Yes, I got her."

On April 21, 2011, Ms. Lowe's car was repossessed.  Indianapolis Metropolitan Police Department Officer Michael Horn was called to a PNC Bank, located a short distance from the Eastgate Station, because Ms. Lowe refused to exit her vehicle.  Ms. Calhoon was present at the

scene and informed Ms. Lowe twice[3] that if she did not exit her vehicle and come back to work, she would be put on Emergency Placement ("EP"). After this incident, Ms. Calhoon requested Officer Horn to come to the Eastgate Station and provide a written statement of this incident. On April 28, 2011, Officer Horn met with both Ms. Calhoon and Ms. Kennedy-Johnson. While discussing the April 21, 2011 incident, Officer Horn heard Ms. Calhoon state to Ms. Johnson, "I think we have finally got her." Ms. Calhoon then explained to Officer Horn that they had experienced a lot of problems with Ms. Lowe.

As a result of this incident, Ms. Lowe was placed on EP on April 29, 2011, for refusing to obey two direct orders. Ms. Lowe appealed this decision, and it was rescinded on July 15, 2011, as Officer Horn refuted Ms. Calhoon's allegations that she gave two direct orders to Ms. Lowe on April 21, 2011. On May 20, 2011, Ms. Calhoon again placed Ms. Lowe on EP, alleging she attempted to receive pay for time periods during which she performed no work. This decision was appealed, and it too was rescinded by the July 15, 2011, letter. Throughout the appeals process, Ms. Lowe continued to experience harassment from her supervisors, and others observed that her supervisors seemed to target her for "not a good reason."

On June 13, 2011, Ms. Lowe filed an EEO complaint alleging discrimination based on retaliation for her prior 2008 EEO complaint.

Ms. Lowe was off work from May through November 2011; in November 2011, she began reporting to the Nora Branch of the USPS. In July 2011, Carmen Jennings became the new CSOM and became aware of both the proposed Letter of Warning and the Proposed Notice of Removal issued to Ms. Lowe, neither of which had become finalized. Ms. Jennings met with

---

[3] Because Ms. Lowe was inside her vehicle, with the windows closed, talking on her cellular phone, Officer Horn noted that he doubts Ms. Lowe heard Ms. Calhoon's second request to exit the vehicle.

Ms. Lowe and her attorney in November or December 2011. After the meeting, Ms. Jennings concluded that both disciplinary actions were warranted and sustained both proposals. Ms. Lowe received the Letter of Warning on December 9, 2011, and she received the Letter of Decision – Removal on December 23, 2011, ending her twenty-four year career with the USPS.

## III. DISCUSSION

Ms. Lowe brings this action against the Defendant pursuant to 22 U.S.C. § 2000e, *et. seq.*, alleging that he retaliated against her for her prior protected EEO activity when he issued her a Letter of Warning and a Letter of Decision – Removal.[4] "To plead a retaliation claim under Title VII, a plaintiff must allege that she engaged in statutorily protected activity and was subjected to adverse employment action as a result of that activity[.]" *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013). Ms. Lowe has chosen to meet her prima facie case under the indirect method of proof.[5] The Seventh Circuit has described this method as follows:

> [T]he indirect method or the *McDonnell Douglas* test, has three steps. The first step is that the plaintiff must come forward with evidence of a prima facie case, which has four elements as adapted for this case: (1) plaintiff engaged in activity protected by law; (2) he met his employer's legitimate expectations, *i.e.,* he was performing his job satisfactorily; (3) he suffered a materially adverse action; and (4) he was treated less favorably than a similarly situated employee who did not engage in the activity protected by law. If the employee has evidence on each of these four elements of the prima facie case, the burden shifts to the employer at the second step of the indirect method to articulate (but not necessarily prove) a legally permissible reason for the adverse employment action. If the employer does so, the analysis moves to the third step, in which the employee tries to show that the employer's stated reason is false, and falsity permits a reasonable inference that the real reason was unlawful.

*Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 641-42 (7th Cir. 2013) (internal citations omitted).

---

[4] Ms. Lowe's Amended Complaint also alleges retaliation based on the two EP decisions; however, she voluntarily dropped those claims during her deposition. *See* Lowe Dep. at 133-34.

[5] Ms. Lowe makes no arguments under the direct method of proof.

As an initial matter, the Defendant argues that because the proposed employment actions were initiated before Lowe filed her June 13, 2011, EEO complaint, her retaliation claim fails. The Court disagrees. Ms. Lowe's termination occurred after she engaged in protected activity: filing an EEO complaint. Accordingly, the Court will consider her termination as an adverse employment action for the purpose of this motion. With that in mind, the Court turns to the other elements Ms. Lowe must satisfy in order to meet her prima facie case under the indirect method.

The Defendant argues that Ms. Lowe cannot meet her prima facie case because she cannot identify any similarly situated employee who did not engage in protected activity and who was treated more favorably than she. *See Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (noting that the indirect method of proof "requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner."). In her Response, Ms. Lowe identifies Deanna Evans, a morning supervisor for USPS, as a similarly situated employee. Ms. Lowe argues that Ms. Evans was an equal participant in the decision to return the First Class Mail postcards back to the P&DC on April 2, 2011, that she was also supervised by Ms. Calhoon, and that she did not receive any discipline for her participation in the First Class Mail postcard incident.

The Court agrees with the Defendant that Ms. Evans is not similarly situated to Ms. Lowe because their performance histories differ greatly. As the Defendant notes, Ms. Lowe was terminated for three reasons: 1) reporting that the Business Reply mail had been cleared on March 29, 2011, and April 2, 2011, when it had not been; 2) sending back the First Class Mail postcards to the P&DC on April 2, 2011, causing their delivery to be delayed; and 3) failing to perform street observations and failing to deliver a number of packages on April 2, 2011. *See*

dkt. no. 52-10. In other words, Ms. Lowe was removed from her position with the USPS for additional reasons, not just due to the First Class Mail postcard incident. It is also undisputed that Ms. Lowe had a prior disciplinary history due to her Proposed Letter of Warning that was issued in March 2010, likely influencing the decision that a greater discipline was warranted in her case.

In contrast, Ms. Evans is only alleged to have participated in the First Class Mail postcard incident, and there is no evidence to suggest that she too had a prior disciplinary history. Therefore, there are significant differences between Ms. Evans' job performance and that of Ms. Lowe that preclude the Court from agreeing with Ms. Lowe that Ms. Evans is similarly situated. In other words, the Court cannot say that the only reason Ms. Lowe was terminated and Ms. Evans was not was because Ms. Lowe filed an EEO Complaint.[6] *See Bates v. City of Chicago*, 726 F.3d 951, 955 (7th Cir. 2013) ("[T]he comparator must still be similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable[.]" (internal quotation marks omitted)). Because Ms. Lowe has identified no similarly situated employee who did not engage in protected activity and was treated more favorably than she, she has not met her prima facie case under the indirect method of proof. Accordingly, the Defendant's motion for summary judgment on her retaliation claim is **GRANTED**.

---

[6] While the Defendant does not make this argument, the Court notes that the fact Ms. Evans received no discipline at all for the First Class Mail postcard incident in April 2011, does not support Ms. Lowe's retaliation claim either. As has been noted above, Ms. Lowe filed her EEO Complaint *after* she received the Proposed Letter of Decision – Removal. Therefore, the fact that Ms. Evans was not disciplined for the First Class Mail postcard incident in April 2011, but Ms. Lowe was, cannot be because Ms. Lowe filed an EEO Complaint. The EEO Complaint did not exist in April 2011; it was filed two months later.

## IV. **CONCLUSION**

For the foregoing reasons, the Defendant's motion for summary judgment (dkt. no. 48) is **GRANTED IN ITS ENTIRETY**.

SO ORDERED: 04/23/2014

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication